IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-HC-02187-M

UNITED STATES OF AMERICA,

    Petitioner,

v.

JAMES IZLAR,

    Respondent.

ORDER

This matter comes before the court on the United States' Certificate of a Sexually Dangerous Person pursuant to 18 U.S.C. § 4248 [DE 1]. The United States seeks an order committing the Respondent James Izlar ("Izlar") to the custody of the Attorney General as a sexually dangerous person under the Adam Walsh Act. On July 2–3, 2025, the court held an evidentiary hearing on the matter. After careful consideration, the court finds that the United States has not shown by clear and convincing evidence that Izlar is a sexually dangerous person. *See* 18 U.S.C. § 4248(d). Accordingly, its petition for a commitment order is denied.

I. **Case Background**

On February 13, 2015, Izlar pleaded guilty to two counts of Second-Degree Child Sex Abuse in the Superior Court of the District of Columbia. DE 37-1 at 19. On June 18, 2015, he was sentenced to a term of imprisonment of 144 months, to be followed by seven years of supervised release. Gov's Ex. 31. Before the initiation of these proceedings, his projected release date was January 11, 2025. DE 1-1 at 1.

Prior to his release date, Izlar was referred for a psychological evaluation by the Federal Bureau of Prisons ("BOP") Sex Offender Certification Review Branch ("SOCRB"). DE 7-1 at 1.

The case was assigned to Dr. Kelsey Laxton, who evaluated Respondent to assess whether he was a "sexually dangerous person" under the Adam Walsh Act. *Id.* Ultimately, she concluded that he was, *id.* at 19, and on October 15, 2024, the United States filed a certificate pursuant to 18 U.S.C. § 4248. DE 1.

The parties each sought additional examinations, DE 13, 14, 29, 32, and the court granted those motions. DE 15, 16, 36. Before the court for consideration is the certification report authored by Dr. Laxton and the evaluations authored by Drs. Mark E. Hastings, Joseph Plaud, Brian Abbott, and C. Mark Patterson. DE 7-1, 25-1, 28, 30, 37-1. Izlar and each of the experts testified at the evidentiary hearing. The parties have filed proposed findings of fact and conclusions of law, DE 52, 53, and this matter is now ripe for adjudication.

## II. Findings of Fact

### A. Personal History

Izlar was born on October 7, 1977, in Albuquerque, New Mexico, to the marital union of James Izlar and Arlene McCall. Gov's Ex. 30 at 9. His family moved to Washington, D.C. when his father's military service was transferred. DE 37-1 at 7. At the age of six, his parents divorced, and he was thereafter raised primarily by his mother. *Id.* His father provided no physical or financial support after the separation, but Izlar indicates that he grew up with the basic necessities of life. DE 30 at 2. Izlar also reports that he did not experience abuse or neglect during his childhood, but he did confirm that his mother was a strict disciplinarian and would spank and punch him, believing that these forms of punishment were necessary for male children. *Id.* at 3.

Izlar reports that they lived "in a rough neighborhood . . . called Simple City," where he was exposed to violent crime and substance abuse. DE 37-1 at 7. When he was a teenager, he witnessed a friend from school get shot in the head. Trans. DE 54 at 76:19–22. Around the same

2

time, he began to experiment with drugs and alcohol. *Id.* at 79:2–14. He started with alcohol and marijuana, but eventually, he progressed to using PCP and ecstasy. *Id.* at 79:16. He testified at the evidentiary hearing that he would use these substances "[a]s long as it was around." *Id.* at 79:18. He further reported experiencing "black-outs" and memory loss on account of his substance use. *Id.* at 79:21–80:12.

Izlar struggled academically and was placed in special education courses. DE 37-1 at 8. He attended many different schools because his family moved regularly. According to a 2015 Presentence Report, Izlar had a "learning disability" that his mother believed "played a role in his ability to feel comfortable with older females because they are more mature." *Id.* Izlar identified this disability as dyslexia. *Id.* He completed the 11th grade before dropping out to enroll in the Job Corps in Keystone, Pennsylvania. DE 30 at 4. He did not complete the program; he was expelled after an altercation with another student involving a knife. *Id.* Izlar reported to Dr. Abbott that the incident occurred after he confronted another student about bullying. *Id.* Izlar studied for the GED while in prison, but he could not pass the examination. *Id.* However, while in custody, Izlar obtained an associate's degree in theology from the "Church of Colors" in New Hampshire. *Id.*

Izlar never married, but he has three children, all of whom were born to females that were minors when Izlar impregnated them. *Id.* at 14.

B. Sexual Criminal History

In 1998, Izlar was charged with First-Degree Child Sex Abuse after impregnating a thirteen- or fourteen-year-old girl. DE 25-1 at 9; Gov's Ex. 30 at 4. At the time, Izlar was twenty years old, and the victim had never been sexually active. *Id.* Defendant engaged in vaginal sexual intercourse with the victim at Fletcher-Johnson Junior High School. *Id.* The victim gave birth in

3

1998 and was shortly thereafter diagnosed with gonorrhea, a sexually transmitted disease carried by Izlar at that time. *Id.* Izlar pled guilty to misdemeanor Sex Abuse and was sentenced to 180 days of imprisonment, suspended, with three years of probation. DE 37-1 at 17. On September 28, 1999, his probation was revoked, and he was sentenced to 90 days of imprisonment, to be followed by three years of probation. *Id.*; *see also* DE 25-1 at 7. On May 15, 2002, his probation was revoked a second time, and he was sentenced to time served. *Id.* While the reason for the revocation proceedings are unclear form the record, a Presentence Investigation Report indicates that "while on probation in 2001, Mr. Izlar continued to engage in inappropriate relationships with children" by "pursuing" a thirteen-year-old girl from December 2000 to June 2001. DE 7-1 at 4. Izlar's probation was revoked for a final time on April 28, 2004, and he was sentence to 180 days of imprisonment. DE 37-1 at 17.

In 2005, while on parole for an Escape from Institution conviction, Izlar was charged with committing Second-Degree Child Sex Abuse by vaginally and anally raping a thirteen-year-old girl. *Id.* at 18. Izlar, who was twenty-eight at the time, was dating a woman named Michelle, with whom he had a sexual relationship. DE 25-1 at 10. While he was at her home, a thirteen-year-old girl came over to visit Michelle's son. *Id.* Izlar invited the girl to watch television with him, and eventually, all four individuals fell asleep in the living room floor. *Id.* The victim reported that Izlar began to lick her breasts and kiss her neck and face. *Id.* Izlar then pulled down the victim's pants and vaginally raped her. *Id.* When Michelle woke up, Izlar pretended that he was asleep, and she went into her bedroom. *Id.* Izlar then attempted to anally rape the victim. *Id.* When Michelle returned from the bedroom, she pulled off the covers and saw that Izlar was naked. *Id.* Izlar denied any wrongdoing, grabbed his clothes, and fled after Michelle indicated she was going to contact the police. *Id.* Izlar testified that he and Michelle had drank alcohol and smoked a

"substantial quantity" of marijuana and PCP prior to falling asleep on the living room floor. Trans. DE 54 at 88:8–21. He acknowledged that he kissed and fondled the victim, but he denies having any memory of vaginal or anal penetration. *Id.* at 21:15–25. He was convicted on August 3, 2006, and sentenced to 48 months of imprisonment, to be followed by five years of supervised release. DE 37-1 at 18. After his release on December 3, 2010, Izlar's supervised release was revoked twice, once in October 2011 and once in December 2013. DE 37-1 at 19.

Before he was apprehended for the December 2013 revocation, Izlar committed the sex offense which led to these proceedings. In June 2013, Izlar molested the nine- and six-year-old daughters of a family friend. DE 25-1 at 11. The nine-year-old victim told investigators that while she was sleeping, Izlar rubbed her genitals. Specifically, she stated that he reached underneath her clothes and rubbed her breasts, vagina, and anus with his hand. *Id.* The victim referred to Izlar as "Uncle James" and stated that this occurred several times during the month. *Id.* The six-year-old reported identical behavior, adding that Izlar had kissed her on the lips. *Id.* During Dr. Hastings' evaluation, Izlar reported that he had helped babysit both children. *Id.* He stated that he would give them baths and then get drunk and smoke weed until they went to bed. *Id.* He would then fondle them while they were sleeping and would continue until they woke up. *Id.* He stated that this occurred at least four times over the period of a month. *Id.* Notably, at the evidentiary hearing, Izlar denied admitting the abusive behavior to Dr. Hastings. Trans. DE 54 at 34. In any event, Izlar pleaded guilty to two counts of Second-Degree Child Sex Abuse, and on June 18, 2025, he was sentenced to 144 months of imprisonment, to be followed by seven years of supervised release. Gov's Ex. 31.

Records indicate that Izlar engaged in inappropriate sexual behavior with several other children, though none of these incidents resulted in criminal charges. First, in 1997 or 1998, Izlar

5

kissed a nine-year-old girl on the cheek. DE 25-1 at 11. He testified that the kiss was not sexual in nature and that the victim's parents obtained a restraining order shortly thereafter. Trans. DE 54 at 8. Izlar stated that he was drinking at the time. *Id.* Around the same time, Izlar was investigated for attempting to engage in vaginal intercourse with a six-year-old girl. DE 25-1 at 11. Prosecutors declined to pursue the case for lack of evidence, but the victim was later diagnosed with gonorrhea, which Izlar carried at the time. *Id.* Izlar told Dr. Hastings that he was "probably drinking" when he attempted to have vaginal intercourse with the victim. *Id.* Third, between December 2000 and June 2001, Izlar reportedly pursued and sent love letters to a thirteen-year-old girl. *Id.* at 12. In one of the letters, Izlar discussed the first time that the two kissed, and he wrote that the victim needed to keep the relationship on the "down low." *Id.* at 9. He ceased his pursuit after being confronted by the victim's parents. *Id.* When discussing the events, he stated that "I had people telling me she was young, but did I want to believe it." *Id.* Finally, in April 2011, Izlar admitted to having thirty-four minor victims in a sex offender treatment class, the youngest of which was four-years old. *Id.* at 3. He later denied having that many victims and testified that he manufactured most of the victims on the list (including the four-year old) to appear cooperative in his sex treatment class.

C. Course in Institution

Izlar's time in custody was unremarkable. Records reflect that he incurred just one disciplinary infraction for exchanging money for contraband in April 2020. DE 25-1 at 8. Further, there are no records of significant mental health concerns or treatment. *Id.* Izlar has consistently engaged in courses offered by his facilities. He completed Drug Education courses in 2004 and 2014, the Nonresidential Drug Abuse Program in 2015, and the Anger Management course in 2021. *Id.* While Izlar has previously expressed an interest in completing sex offender treatment,

6

he had not, as of the hearing, completed such a course. *Id.* In 2022, for example, he submitted the paperwork to enroll in a sex offender treatment course but withdrew the following day. *Id.* At the evidentiary hearing, he testified that he withdrew from the class because participation would have required that he transfer from FCI Berlin to a different facility. Trans. DE 54 at 100:1–9. He explained that he had resided at FCI Berlin for several years and was concerned that transferring to a new facility would create a risk to his personal safety on account of previous sex offenses. *Id.* He emphasized, however, that he was willing to participate in sex offender treatment whether he was released or ultimately civilly committed. *Id.* at 100:13–25.

Izlar has maintained contact with family throughout his time in incarceration. *Id.* at 105:2–12. He regularly speaks with his mother, sister, and romantic partner, Angel Robertson. *Id.* He also reported that he has reconnected with one of his daughters. *Id.* at 90:18–91:14.

## III. Discussion

Section 4248 was enacted Adam Walsh Act to "protect children from sexual exploitation and violent crime." *United States v. White*, 927 F.3d 257, 261 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 2554, 206 L. Ed. 2d 489 (2020) (citations omitted). It is applicable to "persons who, due to a mental illness, are sexually dangerous.'" *Id.* A "sexually dangerous person" is defined as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." *United States v. Broncheau*, 645 F.3d 676, 679 (4th Cir. 2011) (citing 18 U.S.C. § 4247(a)(5)). The second part of this question "involves two distinct inquiries, namely, whether the individual 'suffers from a serious mental illness, abnormality, or disorder,' and whether, as a result of any such condition, 'he would have serious difficult in refraining from sexually violent conduct or child molestation if released.'" *United States v. Francis*, 869 F.3d 265, 274 (4th Cir. 2012) (quoting 18 U.S.C. § 4247(a)(6)).

7

"Section 4248 provides that after the government files a certificate with a district court that an inmate 'is a sexually dangerous person,' the court 'shall order a hearing' to determine whether the person is indeed a sexually dangerous person." *White*, 927 F.3d at 261 (citing 18 U.S.C. § 4248(a)). If the court determines the person is sexually dangerous, it "must commit the person to the custody of the Attorney General . . . who is charged to treat the person and release him if and when a court finds, by a preponderance of the evidence, that the person is no longer dangerous or no longer dangerous under prescribed conditions of release." *Id.* (citing § 4248(a), (d), (e)).

In sum, to obtain a civil commitment order under § 4248, the United States must establish three distinct facts by clear and convincing evidence:

(1) the respondent "has engaged or attempted to engage in . . . child molestation" in the past, 18 U.S.C. § 4247(a)(5);

(2) he currently "suffers from a serious mental illness, abnormality, or disorder"; and

(3) as a result of the illness, abnormality, or disorder, he "would have serious difficulty in refraining from . . . child molestation if released," 18 U.S.C. § 4247(a)(6).

*United States v. Hall*, 664 F.3d 456, 461 (4th Cir. 2012). "Clear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." *Id.* (internal brackets and citation omitted).

A. Predicate Offense

The parties have stipulated that Izlar "has prior convictions for child molestation, which satisfies prong one of the Adam Walsh commitment criteria." DE 45 at 1. All three of Izlar's prior sex convictions involved sexual contact with a minor. *See supra* Section II-B. Thus, the court finds that the United States has shown by clear and convincing evidence that Izlar has

8

previously "engaged . . . in sexually violent conduct or child molestation." *See* § 4247(a)(5). The first prong is satisfied.

B.  Serious Mental Disease or Disorder

"Whether [an] individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *United States v. Bolander*, 722 F.3d 199, 207–08 (4th Cir. 2013) (quoting *Addington v. Texas*, 441 U.S. 418, 429 (1979)). A mere diagnosis, however, is only "the starting point." *United States v. Caporale*, 701 F.3d 128, 137 n.4 (4th Cir. 2012). The "true thrust of the § 4247(a)(6) inquiry [is] whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment." *Id.* In other words, the second and third prongs work together to ensure that "civil confinement is limited to those who mental illness renders them dangerous beyond their control." *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012) (citing *United States v. Hall*, 664 F.3d 456, 463 (4th Cir. 2012)).

In this case, the five forensic psychologists disagree on which diagnoses to assign to Izlar.[1] Drs. Hastings, Patterson, and Laxton each diagnosed Izlar with pedophilia and other specified paraphilic disorder and concluded that he suffered from a serious mental illness, abnormality, or disorder, as contemplated by the Adam Walsh Act. *See* DE 25-1 at 18; DE 37-1 at 52; DE 7-1 at 9; Trans. DE 54 at 213:1–11.[2] Dr. Patterson additionally diagnosed Izlar with antisocial personality disorder. DE 37-1 at 52. Drs. Abbott and Plaud both rejected a paraphilic diagnosis of any kind. DE 28 at 17; DE 30 at 44. Though Dr. Abbott did diagnose Izlar with post-traumatic

---

[1] All five experts diagnosed Izlar with various substance abuse disorders.

[2] Dr. Laxton did not initially diagnose Izlar with a pedophilic disorder. *See* DE 7-1 at 9–10. However, she amended her opinion at the evidentiary hearing after reviewing the other expert reports and learning Izlar had engaged in sexual contact with pre-pubescent children in the late 1990s. Trans. DE 54 at 213:1–11.

9

stress disorder ("PTSD"), he concluded (as did Dr. Plaud) that Izlar did not have a qualifying mental illness. DE 30 at 37. The court considers each set of diagnoses in turn.

Pedophilia, as defined by the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders ("DSM-5-TR"), is characterized by recurrent, intense, sexually arousing fantasies, sexual urges, and/or behaviors involving sexual activity with prepubescent children that have persisted for a period of at least six months. DE 25-1 at 18; DE 30 at 45. To assign this diagnosis, these urges or fantasies must "cause marked distress or interpersonal difficulty" and must involve children that are least five years younger than the sexual perpetrator. DE 30 at 45. The experts generally agreed on these criteria, though Drs. Abbott Plaud emphasized that a diagnosis is only appropriate if the individual demonstrates a preference for pre-pubescent children. Trans. DE 54 at 267:25–268:9; DE 55 at 346: 22–25.

A review of the record reveals that Izlar plausibly has between two and four prepubescent victims.[3] The most clearly established are the six- and nine-year-old girls that Izlar molested in June 2013. This behavior led to Izlar's third sex-based conviction. The court also credits the accusation that Izlar attempted to have sexual intercourse with a six-year-old in 1997 or 1998. *See* DE 25-1 at 12. The victim was later diagnosed with gonorrhea, a sexually transmitted disease that Izlar had also given to the thirteen- or fourteen-year-old victim around the same time. *Id.* at 9. Finally, the court also finds credible the allegation that Izlar kissed a nine-year-old girl on the cheek that same year, which prompted the girl's parents to obtain a restraining order. *See id.* at 11.

---

[3] The court notes that in April 2011, Izlar reported in a sex offender treatment class that he had a total of thirty-four victims. *Id.* at 13. When speaking with forensic examiners, Izlar denied having that many victims and maintained that eight was the more appropriate number. Trans. DE 54 at 52:19–53:19. He testified that he felt pressured by treatment providers to divulge more victims than what was documented in order to progress in his treatment and avoid being sent back to jail. *Id.* Given the lack of evidence in the record corroborating these admissions, the court credits Izlar's explanation.

10

In sum, Izlar likely has two pre-pubescent victims in 1997 or 1998 and two pre-pubescent victims in June 2013.

The experts dispute whether the above-described behavior supports an inference that Izlar's sexual urges towards prepubescent children persisted for more than six months. Dr. Patterson, for example, framed the question as a matter of range. He testified that because more than six months passed between Izlar's first documented instance of pedophilic behavior (the late 1990s) and his most recent (mid-2013), the persistence criterion was easily satisfied. Trans. DE 54 at 143:17–144:3. Dr. Plaud disagreed. He argued that the six-month criterion does not look at the passage of time in the aggregate. DE 55 at 309: 7–23. Instead, it is designed to determine whether a person is engaging with recurrent and intense sexually deviant behavior over a sustained period of time. *Id.* In this case, he found that the fifteen-year gap between pedophilic behavior precluded a finding that a diagnosis was warranted. *Id.* On balance, and without opining on the technical criteria established by the DSM-5-TR, the court finds that Dr. Plaud's definition more appropriately captures the "true thrust of the § 4247(a)(6) inquiry." *Caporale*, 701 F.3d at 137 n.4. Therefore, in assessing whether Izlar's proclivity towards prepubescent children[4] so dominates his psyche as to constitute a "serious functional impairment," *id.*, the court finds the length of time between Izlar's offense conduct weighs against a finding of pedophilia. In the absence of other analogue behavior while in custody or other incidents in which Izlar engaged in or attempted to engage in

---

[4] The parties dispute whether Izlar ever had a sexual interest in children sufficient to otherwise support a pedophilia diagnosis. Dr. Abbot testified that while Izlar "clearly had some sexual urges in prepubescent children," it had not risen to the level of a preference. Trans. DE 54 at 267:25–268:2. He also testified that during his evaluation, he tested Izlar with the Visual Reaction Time Test ("VRTT") to ascertain his level of sexual attraction to different demographics. *See* DE 30 at 26. He reported that his findings showed that Izlar had "no clinically significant sexual interest in prepubescent children;" instead, his sexual attraction was directed "towards adolescent females and adult females." Trans. DE 54 at 15–19.

sexual activity with prepubescent children, the court finds that the record has not shown by clear and convincing evidence that Izlar is experiencing sustained, intense, and recurrent behaviors or thoughts towards pre-pubescent children.

Neither has the United States met its burden in showing that prong two is satisfied by hebephilic attraction. Three of the five expert witnesses diagnosed Izlar with "Other Specified Paraphilic Disorder" based on his sexual contact with children who had begun, but not yet finished, puberty. Under the DSM-5-TR, this diagnosis is similarly characterized by recurrent, intense, sexually arousing fantasies, urges, and/or behavior involving pubescent children that have persisted for at least six months. DE 25-1 at 18. At the outset, the court notes Dr. Plaud's contention that hebephilia is not a diagnoseable mental condition. DE 28 at 16. The court need to wade into this technical dispute, however, as the Fourth Circuit has previously held that "hebephilia, as colloquially understood, is a § 4247(a)(6) 'illness, abnormality, or disorder.'" *Caporale*, 701 F.3d at 137 n.4. In this case, it is undisputed that Izlar molested numerous thirteen- and fourteen-year-old girls. The United States contends that these repeated incidents support a diagnosis, but for four reasons, the court disagrees.

First, there is little evidence describing the physical development of each of the victims, so the court is unable to assess whether they were still in puberty. One of the minor victims—the thirteen- or fourteen-year-old girl connected to Izlar's first sex offense—was able to conceive and carry a child. DE 37-1 at 17. As Dr. Abbott testified, while some children in puberty can become pregnant, the capacity to do so suggests that the individual is more physically developed. *See* Trans. DE 54 at 270–71. Further, Izlar described his victims as looking older than their ages suggested. *Id.* Still, as Dr. Patterson testified, female pubescence is typically associated with girls between the ages of eleven and fourteen, so it is certainly possible that at least one of Izlar's

12

victim's fell within this developmental range. Trans. DE 54 at 11–18. Izlar's testimony did not provide any clarity. While on several occasions, he opined as to whether a particular victim had entered puberty, *see, e.g.*, *id.* at 33:4–7 (answering in the negative when asked whether a nine-year-old victim had entered puberty), he more consistently struggled to define what puberty was or what a girl who had entered or completed puberty was supposed to look like. *See id.* at 17:5–8 (stating that he did not know what a person going through puberty was supposed to look like); 85:23–86:5 (stating he could not explain puberty and offering that it involved breasts and hips). The ambiguity as to the victims' development suggests that the United States has not met its burden.

Second, Izlar was often inhibited by alcohol and other controlled substances when he committed the offense conduct. Records indicate that shortly before he raped the thirteen-year-old girl in 2005, he had consumed "significant quantities" of alcohol, marijuana, and PCP. *Id.* at 88:8–21. This course of conduct mirrors how Izlar previously engaged in sex offenses. He indicated that he had consumed alcohol or drugs before molesting the six- and nine-year-old girls in 2013 and before attempting to have vaginal intercourse with the six-year-old in the late 1990s. DE 25-1 at 11. The consistency with which Izlar's offense conduct is connected with substance abuse casts doubt on the United States' argument that Izlar's behavior is driven a persistent attraction towards pubescent children rather than opportunistic behavior exacerbated by substance abuse.

Third, the records suggests that Izlar has diminished mental functioning. During his evaluation, Dr. Abbott administered the WASI-II, a general intelligence, or IQ, test designed to assess an individual's specific and overall cognitive abilities. DE 30 at 26. The results showed that Izlar scored "borderline to low average" on verbal comprehension and "extremely low to

borderline" on perception reasoning and overall IQ. *Id.* Dr. Abbott believed this indicated that Izlar "lacks the ability to understand, analyze, and use language effectively," thus inhibiting his ability to "develop coping behaviors." Trans. DE54 at 274:2–9. Though some records indicate that Izlar has an IQ as low as 70, Dr. Patterson testified that in his interactions with Izlar, he did not perceive him as having an IQ that low. *Id.* at 141:10–13. Izlar's precise IQ notwithstanding, the conclusion that Izlar's mental capacity is below average is consistent with the court's perception of Izlar's testimony at the hearing. As such, this diminished capacity might explain his sparse sexual contact with age-appropriate partners and undermine the theory that he is driven by a pervasive attraction to children. Indeed, Dr. Abbot testified that Izlar's "sexual offending was motivated by trying to satisfy his age-appropriate sexual needs but, clearly, in a highly inappropriate and illegal way." *Id.* at 276:16–18.

Finally, there is little contemporary evidence suggesting that Izlar is experiencing ongoing sexual attraction towards pubescent children. As was noted previously, Izlar has not been observed engaging in offense analogue behaviors, such as acquiring pornography, drawing explicit pictures, or writing explicit stories. Dr. Patterson and Dr. Laxton point out that this is not unusual, as Izlar's victim pool is not present in prison, and in any event, Izlar has historically performed well while incarcerated only to reoffend once he is released. DE 54 at 154:12–19; 253:8–16. The court takes this testimony at face value. There is, however, a notable difference between Izlar's current period in custody and his previous ones. This time, he has maintained a relationship with an age-appropriate partner, Angel Robertson. Izlar has stayed in regular contact with Angel over the past thirteen-to-fourteen years, which as Dr. Abbott testified, is highly unusual in these circumstances. *Id.* at 283:7–22. This longstanding relationship undermines the theory that Izlar's attraction to pubescent children "cause[s] marked distress or interpersonal difficulty."

14

In sum, the record does not firmly establish whether Izlar's sexual offending towards pubescent children is the product of pervasive attraction or whether it results from opportunistic behavior exacerbated by diminished mental functioning and substance abuse. The court is hesitant to conclude one way or the other, which means that the prong two has not been satisfied by clear and convincing evidence. *See Hall*, 664 F.3d at 461.

Finally, Dr. Patterson diagnosed Izlar with Anti-Social Personality Disorder. This diagnosis is characterized by a "pervasive pattern of disregard for and violation of the rights of others, occurring [since the age of fifteen years old], as indicated" by the presence of several factors. DE 37-1 at 57. Additionally, there must be evidence of the onset of a conduct disorder before the age of fifteen. *Id.* Here, the court finds that there is not sufficient evidence of the onset of a conduct disorder prior to when Izlar turned fifteen. Dr. Patterson pointed to a self-reported incident where Izlar was expelled in middle school for fighting, *see* DE 151 at 22–25, but beyond this admission, there are no details from which the court could differentiate between a typical school-yard brawl and more significant antisocial behavior. Further, other evidence largely consists of instances of sex and drug abuse, which the court has previously addressed. So, the court finds that prong two is not satisfied by an antisocial personality disorder diagnosis.

The United States has not shown by clear and convincing evidence that Izlar "suffers from a serious mental illness, abnormality, or disorder." § 4247(a)(6). Civil commitment under is § 4248 is not, therefore, warranted.

### IV. Conclusion

It is undisputed that Izlar engaged in horrific behavior for which he was justly punished. But "[t]he Adam Walsh Act is an extraordinary remedy for extraordinary circumstances." *United States v. Montgomery*, 310 F. Supp. 3d 637, 644 (E.D.N.C. 2018). From the evidence presented,

15

the United States has not shown by clear and convincing evidence that Izlar's present mental state and history of sexual misconduct sufficiently reflects the circumstances warranting indefinite, involuntary commitment under § 4248. Therefore, the United States' petition for an order of commitment is DENIED, and Izlar's oral motion to dismiss is DENIED AS MOOT. The parties shall confer and file a joint status report on or before September 17, 2025, advising the court as to a release plan for Izlar.

SO ORDERED this 9th day of September, 2025.

Richard E Myers II
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE